**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA          :

      v.                          :          **CRIMINAL NO. 25-444-JMG**

MATTHEW JAMES ADDY          :

**GOVERNMENT'S CHANGE OF PLEA MEMORANDUM**

I.  **BACKGROUND**

Defendant Matthew James Addy is charged in an indictment with 13 counts of wire fraud, two counts of aggravated identity theft, and one count of financial institution fraud, in connection with an investment fraud and bank fraud scheme. The defendant has notified the government through his counsel that he wishes to enter guilty pleas to all counts of the indictment.

II.  **APPLICABLE STATUTES AND ESSENTIAL ELEMENTS OF THE OFFENSES**

    A.  **Wire Fraud (18 U.S.C. § 1343) – Counts 1 through 13**

To obtain a conviction for wire fraud in violation of 18 U.S.C. § 1343, the government must prove the following elements beyond a reasonable doubt:

1. the defendant's knowing and willing participation in a scheme or artifice to defraud,

2. with the specific intent to defraud, and

3. the use of interstate wire communications in furtherance of the scheme.

*United States v. Scarfo*, 41 F.4th 136, 198 (3d Cir. 2022) (quoting *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012)); *see also* 3rd Circuit Model Criminal Jury Instructions, No. 6.18.1343 Wire Fraud – Elements of the Offense.

    B.  **Aggravated Identity Theft (18 U.S.C. § 1028A) – Counts 14 and 15**

To prove violations of 18 U.S.C. § 1028A(a)(1) as charged in Counts 14 and 15, the

government must prove the following elements beyond a reasonable doubt:

1.      The defendant knowingly transferred, possessed, or used another person's means of identification;

2.      The defendant did so without lawful authority; and

3.      The defendant did so during and in relation to a certain enumerated crime.

*See United States v. Roberts*, 2015 WL 412001, at *2 n.7 (3d Cir. Jan. 20, 2015). Section 1028A(c) enumerates various crimes as necessary predicates, including 1028A(c)(4), "any provision contained in this chapter (relating to fraud and false statements)," and 1028A(c)(5), "any provision contained in chapter 63 (relating to mail, bank, and wire fraud)." A "means of identification," as defined in Section 1028(d)(7), includes "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any name, social security number, date of birth, official State or government issued driver's license. . . . unique electronic identification number, address, or routing code."  18 U.S.C. § 1028(d)(7). Notably, here, a forged signature is a "name" that qualifies as a means of identification. *United States v. Blixt*, 48 F.3d 882 (9th Cir. 2008); *United States v. Porter*, 745 F.3d 1035 (10th Cir. 2014).

### C.      Financial Institution Fraud (18 U.S.C. § 1344) – Count 16

To obtain a conviction for financial institution fraud, in violation of 18 U.S.C. § 1344, the government must prove the following elements beyond a reasonable doubt:

1.      The defendant knowingly executed a scheme to defraud a financial institution or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of materially false or fraudulent pretenses,

2.      The defendant did so with the intent to defraud the financial institution; and

3.      The deposits of the financial institution were then insured by the National Credit

- 3 -

Union Administration ("NCUA").

*See Loughrin v. United States*, 573 U.S. 351 at 355-358 (2014).

### III.    MAXIMUM PENALTIES

The following statutory maximum sentences apply in this case: on each of Counts 1 through 13, wire fraud, in violation of 18 U.S.C. § 1343, 20 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; on each of Counts 14 and 15, aggravated identity theft, in violation of 18 U.S.C. § 1028A, a mandatory minimum term of imprisonment of two years, and on one of the two counts, the sentence must be served consecutive to any other sentence imposed, a $250,000 fine per count, a $100 special assessment per count, and a one-year period of supervised release; on Count 16, financial institution fraud, in violation of 18 U.S.C. § 1344, 30 years' imprisonment, a five-year period of supervised release, a $1,000,000 fine, and a $100 special assessment.

The total permissible statutory maximum sentence is a term of imprisonment of 294 years, including a mandatory consecutive sentence of two years; a $4,750,000 fine, $1,600 in special assessments, and a term of supervised release of five years. Full restitution shall also be ordered, in an approximate amount of $755,995 ($722,495 on Counts 1 – 11, $25,000 on Counts 12 and 13, and $8,500 on Count 16). Forfeiture of all proceeds from the offenses also may be ordered.

### IV.    FACTUAL BASIS FOR THE PLEA

If this case were to proceed to trial, the government would prove the following facts, among others, through witness testimony and exhibits. This memorandum sets forth only the essential facts that would need to be proved to establish the elements of the offenses to which the defendant will be pleading guilty.

During the indictment period, that is, from January 2020 until June 2023, in Lancaster County, defendant Matthew James Addy ("Addy") operated investment fraud schemes against two individual victims, identified in the indictment as Victim 1 and Victim 2. Addy also stole Victim 1's identity in connection with obtaining two loans in the name of Victim 1's oral surgery practice, without Victim 1's knowledge, the proceeds of which loans Addy diverted to his own use. In addition, in mid-2021, Addy committed bank fraud against the credit union where he held an account.

### Counts 1 through 11 and 14 and 15 -- Victim 1

Defendant Matthew Addy met Victim 1, an oral surgeon, in late 2019. The two men became friendly, and by December 2019, Addy had persuaded Victim 1 to let him (Addy) manage Victim 1's medical spa, in Lancaster County ("the spa"). Addy managed the spa for approximately two years. The wire fraud charges arise from Addy's repeated requests that Victim 1 invest in supposed investment opportunities, which requests were memorialized in text messages and emails, between (1) Addy and Victim 1, and (2) "Lina Kong" and Victim 1.  Those text messages would be introduced at trial.

Addy told Victim 1 that "Lina Kong" was employed as Addy's assistant at the Yarah Group. Addy claimed that the Yarah Group was his consulting business, located in Beverly Hills, California, worth approximately $200,000,000. According to Addy, "Lina Kong" passed away in June 2022. In a text message to Victim 1, Addy stated, "and no car accident, at least that is what I was told fml" (Addy text to Victim 1 6/2/2022). Earlier, a second "employee" of the Yarah Group, "Steven Kale," allegedly took over for "Lina Kong" in December 2021. Shortly after that, "Lina Kong" supposedly came back to work for Addy prior to her passing. From time to time, Addy also claimed to witnesses that "Steven Kale" was his lawyer. But the FBI's investigation found no

evidence to verify that either "employee" was a real person who worked for Addy, as opposed to Addy utilizing these names himself as part of his scheme to defraud Victim 1.

Turning first to the Yarah Group, investigators found no evidence that the Yarah Group was a legitimate business, much less a multi-million-dollar business as Addy portrayed it to Victim 1. At trial, an FBI analyst would summarize financial records, including Addy's financial records. That analysis shows that while Addy opened Paypal and Venmo accounts in the name of the Yarah Group, and urged Victim 1 to send funds to those accounts, and to various bank accounts, in order to buy into Addy's investment opportunities, all of Victim 1's "invested" money appears to have been spent by Addy for purposes other than what Addy promised. In addition, beginning in February 2018, the Yarah Group had a nearly totally inactive Facebook page which identified an alleged "employee" of the company. At a trial, this so-called employee ("H-L") would testify that he met Addy years ago when both worked at a hotel near Morgantown, PA. H-L would testify that he never worked for the Yarah Group and was not paid any wages by Addy or the Yarah Group.

Turning to "Kong" and "Kale," the "employees" of the so-called Yarah Group who purportedly communicated with Victim 1 by email and text message, the evidence would show that these "employees" were invented by Addy. No payroll was ever identified as being paid to "Kong" or "Kale." No witness ever saw "Kong" or "Kale" in person. No witness spoke to "Kale" or "Kong" on the telephone. At trial, an FBI agent would testify about his analysis of the IP address log-ons for the email address Addy used, and the email address purportedly associated with "Lina Kong" and later, "Steven Kale." The analysis shows generally that there were very few log-ins from California, where the Yarah Group was supposedly headquartered. The vast majority of what few California log-ins there were, coincided with Addy's use of his own email address, at the same time, from the same IP addresses. Similarly, as to the log-ins

from Pennsylvania that contained a location, there were hundreds of examples where the m.addy and lina.kong email addresses logged on at the exact same time (or seconds apart) to the same IP address. In addition, subscriber records associated with this IP address would be introduced at trial, showing that while the user was listed as "Matt James" – Addy's first and middle names -- Addy made "Lina Kong" the financially liable party, and told the phone company that his (Addy's) own residence address in Pennsylvania was "Kong's" address. Addy listed himself, the user of the cell phone, "Matt James," as living in Missouri. This evidence would show that one person was controlling both email accounts, and not persons employed by Addy.

A financial analyst would summarize records and testify at trial, to prove that Addy did not send Victim 1's money to third parties to invest it, as Addy repeatedly promised he would do. Instead, the defendant used Victim 1's money to fund his comfortable lifestyle. He bought a house and a BMW with Victim 1's money. In addition, as explained in more detail below, as part of the scheme targeting Victim 1, Addy committed aggravated identity theft when he used Victim 1's name and social security number twice, in November 2021, to take out two loans from two different lenders in the name of Victim 1's oral surgery practice (not the spa), without Victim 1's approval or knowledge. This activity is the subject of Counts 9, 10, 11, 14 and 15. Moreover, in text messages he sent to Victim 1 in 2022, Addy admitted that he had taken out the loans. Addy never claimed, in text messages or otherwise, that he had Victim 1's authorization to take out the loans, or authorization to use Victim 1's means of identification to get the loans. Instead, Addy promised to repay the loans, but never did.

<em>Counts One through Three – Watch Deal</em>

On or about February 23, 2021, Addy texted Victim 1 about an expansion on watch

distribution.  Addy texted Victim 1 "It's an expansion on our watch distribution. It's a 60-day float with 10% return. Total is $42k. If you want, if you can do 15k I will cover the rest."

On or about February 25, 2021, Addy texted Victim 1 asking if he would do the watch deal. Addy told Victim 1 he would give Victim 1 the entire deal as it appeared Victim 1 needed the cash sooner than Addy. Addy recommended that Victim 1 invest $30,000. These text messages, as well as those that follow between the defendant and Victim 1, would be introduced at trial.

- 02/25/21 – Victim 1 sent $18,000 to Addy's Yarah Group PayPal account (Count 1). Funds were withdrawn that same day to Visa debit card X5627, in Addy's name.

-  03/03/21 – Victim 1 sent $10,000 to the Yarah Group PayPal account (Count 2). Funds were withdrawn that same day to Visa debit card X5627, in Addy's name.

- 03/13/21 – Victim 1 sent $6,000 to the Yarah Group PayPal account (Count 3). Funds were withdrawn that same day to MasterCard debit card X5168, in Addy's name.

As to Counts 1 through 3, Victim 1 would testify that when Addy told him that he (Addy) was in the jewelry business, he believed it, and further believed Addy's claim that Addy would invest Victim 1's funds in a watch deal. Victim 1 would testify that he initiated the transfers requested by Addy from Lancaster, Pennsylvania to the Yarah Group Paypal account. A representative of Paypal would testify at trial that these transfers were processed through servers located in Utah, Arizona or Nevada. Victim 1 received no return on this "investment."

*Counts Four and Five – Contracting Company*

On or about July 23, 2021, "Lina Kong" texted Victim 1 that "Mr. Addy" was planning to purchase a contracting company. Kong asked if Victim 1 would like to partner with Addy; the cost was 40% at $40,000 and Victim 1 would be paid $4,000 monthly plus an annual profit share. In

addition, Victim 1 would get back his initial investment within 12 months.

On or about July 25, 2021, "Kong" asked Victim 1 by text if he wanted to buy in at 40%. Kong suggested that Victim 1 send $4,000 by Venmo and the remainder by check. The next day, "Kong" told Victim 1 by text that they sent a Venmo request.

On July 26, 2021, Victim 1 sent $4,000 via Venmo to Addy's Yarah Group Venmo account (Count 4). Funds were withdrawn that same day to an unknown account.

On or about July 28, 2021, "Kong" requested by text that Victim 1 deposit $36,000 into Addy's Santander bank account. The next day, "Kong" asked by text if Victim 1 was depositing the funds today. Later that day, a $36,000 check from Victim 1 was deposited into Addy's Santander bank account (Count 5).

Over the following days, funds were spent on items such as an American Express payment, an Apple purchase, a $5,000 cash withdrawal, a $2,000 cash withdrawal, and a payment of $7,087.12 to the Hershey Country Club. Victim 1 received no return on the "investment."

As to Counts 4 and 5, Victim 1 would testify that he believed that Lina Kong was Addy's assistant, and that Addy would invest Victim 1's funds to purchase a contracting company as promised. Victim 1 would testify that he made the $4,000 Venmo transfer from Lancaster, Pennsylvania to the Yarah Group Venmo account. A representative of Venmo would testify at trial that this transfer was processed through servers located in Virginia. As to Count 5, Victim 1 would testify that he made a counter deposit of check number 3447, payable to Matthew Addy, on which he wrote "construction deal" in the memo line, at the former Western Corners Santander Bank branch, and Santander records confirm this. A representative of Santander would testify that when a counter deposit is made, Santander Bank processes the check information through servers in Queretaro, Mexico.

*Counts Six and Seven – Construction Company purchase/Yarah Group*

On or about August 3, 2021, "Kong" texted Victim 1 about a potential company for purchase. On or about August 7, 2021, "Kong" texted Victim 1 that "Mr. Addy" was moving forward with purchase of a construction company. Kong stated they sent a $2,000 Venmo request and will send an additional $4,000 request in two days. On August 8, 2021, Victim 1 sent $2,000 to Addy's Yarah Group Venmo account (Count 6). Funds were withdrawn the following day to Santander checking account x8489, an account in Matthew Addy's name. Funds were spent at various stores, including $1,217.94 at Crate and Barrel.

On or about August 10, 2021, "Kong" texted Victim 1 asking if he would be making a deposit today. Kong confirmed that the amount was $65,000 and suggested that Addy could drive by to pick up the funds.

On or about August 11, 2021, "Kong" texted Victim 1 to ask if Addy could stop by to pick up the check. Victim 1 texted Kong that a check would be at his office. Kong confirmed that Addy was on his way to pick up the check. That same day, a $65,000 check from Victim 1 was deposited into Santander checking account x8489, in Matthew Addy's name. (Count 7)

The next day, a $45,000 check was written, payable to the spa. The remainder of the funds was spent at various retail stores. Victim 1 received no return on his "investment."

On Counts 6 and 7, Victim 1 would testify that he believed that Lina Kong was Addy's assistant, and that Addy would invest Victim 1's funds to purchase a construction company as promised. As to Count 6, Victim 1 would testify that he made the $2,000 Venmo transfer from Lancaster, Pennsylvania to the Yarah Group Venmo account. A representative of Venmo would testify at trial that this transfer was processed through servers located in Virginia. As to Count 7, Victim 1 would introduce check number 3447, testify that he made that $65,000 check payable to

Addy, wrote "construction company purchase/Yarah Group" on the memo line, and left it at his office for Addy to pick up. Santander Bank records show that a counter deposit was made of Victim 1's check at the former Western Corners Santander Bank branch. A representative of Santander would testify that when a counter deposit is made, Santander Bank processes the check information through servers in Queretaro, Mexico.

*Count Eight – Plumbing Company purchase/Yarah Group*

On or about August 13, 2021, "Kong" texted Victim 1 about the purchase of a plumbing company valued at $1,500,000. Kong explained that Addy negotiated a purchase price of $375,000. Kong requested that Victim 1 invest $150,000 to $170,000.

On or about September 2, 2021, "Kong" texted Victim 1 about the potential acquisition. Kong texted Victim 1 that an investment between $150,000 to $180,000 would make Victim 1 a 49% partner. Between September 15 and September 22, 2021, "Kong" texted Victim 1 repeatedly, asking Victim 1 when he would have the funds.

On or about September 23, 2021, "Kong" texted Victim 1, asking if Victim 1 could deposit the funds today.  Kong texted that the funds would be going to Addy's Santander Bank account. According to Kong, Victim 1 would receive a promissory note. Also, on or about September 23, 2021, "Kong" texted Victim 1, asking Victim 1 if Addy could pick up a check. Kong told Victim 1 they would close on the business purchase Wednesday.

On or about September 24, 2021, Victim 1 texted "Kong" saying that the transfer happened and that Addy could pick up a $184,000 check and Victim 1 would Venmo $4,000.  Later that same day, a $184,000 check from Victim 1 was deposited into Santander checking account x8489, in the name of Matthew Addy (Count 8). A few days later on September 27, 2021, a $20,000 check was written to the spa; however, this check was later returned. And on October 5, 2021, a $160,000

check was written on account x8489 payable to Abstract & Associates, a title insurance company located in Lancaster, PA.  The memo on the check stated "1527 Ridge Road Lancaster PA," a house that Addy purchased.  Payments were also made to Steve's Pianos and for Addy's mortgage at 1527 Ridge Road.

On or about November 11, 2022, Victim 1 texted Addy asking how the "construction company" was doing.  The defendant texted back that they suck but all will be made right, writing "Despite any losses incurred I will take care of it." Victim 1 received no return on his "investment."

On Count 8, Victim 1 would testify that he believed that Lina Kong was Addy's assistant, and that Addy would invest Victim 1's funds to purchase a construction company as promised. He would identify his check number 3448, payable to Addy for $184,000, on which he wrote "construction company investment" in the memo line. Santander Bank records show that Victim 1's check was deposited at the former Western Corners Santander Bank branch. A representative of Santander would testify that when a counter deposit is made, Santander Bank processes the check information through servers in Queretaro, Mexico.

*Counts Nine and Fourteen – JB&B Capital Loan*

On or about February 27, 2020, Addy texted Victim 1, asking for a copy of Victim 1's driver's license. Victim 1 texted back a copy of his driver's license.

On or about November 15, 2021, Addy received an e-mail from JB&B Capital about a loan Addy was attempting to take out, allegedly for Victim 1's oral surgery practice.  The email requested a signature for Victim 1's oral surgery practice. The equipment finance agreement was digitally signed by Addy, using Victim 1's name and electronic signature. Victim 1 was listed as guarantor. The total cost to finance was listed as $106,995. Addy's e-mail address was listed as the

contact. Included in the application was Victim 1's driver's license, which Victim 1 had sent to Addy, at Addy's request, nearly 21 months prior. The financing application included Victim 1's name, oral surgery practice name, home address, Social Security Number ("SSN"), and phone number. The credit application included Victim 1's name, oral surgery practice name, practice address, and SSN. Victim 1's e-mail address was listed as idk@idk.com. Addy's e-mail was listed on the application (Counts 9 and 14).  The equipment to be financed was for the spa and not for Victim 1's oral surgery practice.

On or about April 26, 2022, Victim 1 received an e-mail from JB&B Capital. Addy e-mailed Victim 1 and Victim 1's lawyer, stating that the e-mail was because of a recent returned payment. Addy requested to "take it all on so [Victim 1] does not have to deal with it."

The loan eventually defaulted, and a lawsuit was filed against Victim 1 as guarantor. Victim 1's identity was stolen as part of the scheme.

On Counts 9 and 14, Victim 1 would testify that he never gave Addy permission to obtain the JB&B Capital equipment finance loan, much less to apply for it as if it were to finance equipment for the oral surgery practice, using Victim 1's name, electronic signature, and social security number. Victim 1 would testify that he did not know about that loan until he (Victim 1) got the email from JB&B Capital in April 2022, five months after Addy obtained the loan. Victim 1 would testify that he did not know what equipment Addy obtained for the spa using the loan funds. Later, when the spa facilities were re-rented, no equipment was located there. A representative of JB&B Capital would introduce the loan documents. The evidence would show further that when Addy filled out the electronic application in the name of Victim 1's oral surgery practice, using Victim 1's name, he was in this district and the application was transmitted to the lender via Pinnacle Bank servers located in Franklin, Tennessee.

*Counts Ten, Eleven and Fifteen – CAN Capital Loan*

On or about October 19, 2021, "Kong" texted Victim 1 asking for the EIN and years of operation for Victim 1's oral surgery practice. On or about October 22, 2021, Addy, on a text chain with "Kong," texted Victim 1 asking for tax ID and years of operation for Victim 1's practice. Further, Addy texted, "Can you send that over today so we can get this loan dealt with by a re-financing. The practice isn't a guarantor more of a sense of stability sign. I can also put Yarah Group up too to show them."

On or about November 3, 2021, "Kong" texted Victim 1 and stated they were almost done with the refinance. Kong asked Victim 1 for the last three months of bank statements for Victim 1's practice. Kong stated that Yarah Group will would be sending in their bank statements.

On or about November 4, 2021, "Kong" texted Victim 1 and asked to send over the practice bank statements.  On or about November 5, 2021, Victim 1 sent an e-mail to "Kong" including an e-mail address for Victim 1's employee, Employee 1. Kong then e-mailed Employee 1 requesting three months of bank statements for Victim 1's oral surgery practice. Employee 1 then e-mailed Kong three months of bank statements.

On or about November 12, 2021, "Steven Kale," the second fake Yarah Group employee who allegedly "replaced" Kong, emailed Employee 1 asking for a bank statement and voided check for Victim 1's practice.  Meanwhile, also on November 12, 2021, the original fake employee, Kong, texted Victim 1 asking for Employee 1 to send over the information.

On or about November 15, 2021, "Kale" texted Victim 1 that Employee 1 needed a couple of items. Kale emailed Employee 1 asking to pick up the voided check as the image was blurry.

On or about November 16, 2021, Addy signed a Certification of Beneficial Owner form for a loan, signed by Addy's e-mail address utilizing an IP address later associated with Addy. Victim

1's name, date of birth, address, and SSN were included on the form. "Kale" then emailed Employee 1 confirming that "Mr. Addy" would pick up the documents.

On or about November 17, 2021, a business loan agreement was signed between CAN Capital ("Lender") and Victim 1's oral surgery practice ("Borrower"). The signing principal was listed as Victim 1, including his home address. The loan was for $150,000, with a total repayment amount of $205,500, plus an origination fee of 2.99%. The contact information was Addy's e-mail address and an unknown number. The agreement was digitally signed by Addy using the name and digital signature of Victim 1 (Count 10). That same day, "Kong" texted Victim 1, stating that the capital infusion would be coming in tomorrow.

On or about November 18, 2021, "Kong" e-mailed Employee 1 that the financial restructuring was cleared; however, the funds ($150,000) were allegedly accidentally deposited into Victim 1's oral surgery practice account. Kong asked to pick up a check for the funds, telling Employee 1 that they could call "Mr. Addy" who would explain.

That same day, Addy e-mailed Employee 1 from his own m.addy email address, even though he was pretending to be "Lina Kong," stating, "If you can make one check out for $143,000 for [the spa] and $7,500 to Matthew Addy. He is covering payroll and needs to be reinbursed (sic) since we can't get the check today. If we got the check today and it clears tomorrow we could still deposit today. It's up to you, please let us know. Mr. Addy can pick them up when you are ready."

Also that same day, "Kong" texted Victim 1 in a supposed group text with Addy, stating, "Our new capital infusion made a mistake, they put the money in [Victim 1's practice account.] I will create an invoice for your records but that money needs to be moved today. The total amount was $150,000. Mr. Addy can you explain to [Victim 1] how we structured this? Can someone get a check cut today to be deposited into [the spa]." Addy texted asking how this happened. Kong

replied "When they were venting [sic] both you and [Victim 1], they accidentally put it into [Victim 1's practice account.] I don't want to ask them to pull it and redeposit it due to time."

On or about November 19, 2021, a $142,500 check from Victim 1's practice bank account at M&T Bank was deposited into an account at Truist Bank (Count 11). That same day, a $90,000 check was made out to cash and the cash was withdrawn from the Truist account on 11/22/21. Other proceeds of these funds were transferred to Addy's Venmo account.

On or about December 6, 2021, Employee 1 e-mailed Addy and Victim 1, saying that Victim 1's practice had been paying a CAN Capital loan every two weeks. Later that day, "Kong" e-mailed Employee 1 stating they were not sure what happened but that they would rectify it.

During the period between November 18, 2021 and July 14, 2022, Victim 1's practice paid $73,643.60 on the loan. Victim 1's identity was stolen as part of the scheme.

On Counts 10, 11 and 15, Victim 1 would testify that he never gave Addy permission to impersonate him to obtain the $150,000 CAN Capital loan on behalf of Victim 1's practice, and he did not know that Addy had done so until he learned that his practice had been repaying that loan every two weeks. Victim 1 would testify that he believed Addy, "Kong," and "Kale" when they told him that Addy was seeking a capital infusion from outside investors to refinance the spa. Victim 1 also believed Addy when Addy said that Victim 1's oral surgery practice was not a guarantor on the loan, and that the Yarah Group would be submitting its bank records in support of the loan as well. As to Count 10, the evidence would show that when Addy filled out the electronic application in the name of Victim 1's oral surgery practice, using Victim 1's name and digital signature, Addy was in this district. On Count 10, a representative of CAN Capital would introduce the loan documents and testify that the application was transmitted to the lender, via WebBank's servers located in Utah and Texas. As to Count 11, a representative of Truist Bank would testify

and admit records showing that Victim 1's business check number 10289, drawn on M&T Bank, and payable to the spa in the amount of $142,500, was deposited at the counter on or about November 19, and that when Truist Bank receives a counter deposit, it processes it electronically through servers located in North Carolina.

*Counts Twelve and Thirteen – Victim 2*

At trial, Victim 2 would testify to the following: Victim 2 is a professional who came to the United States after living in London, England. Victim 2 met Addy and his then-second wife at a Lancaster, Pennsylvania restaurant in approximately April 2023. Addy told Victim 2 that he worked as a diamond dealer. Addy, his wife, and Victim 2 became socially friendly. Addy told Victim 2 that his son was interested in attending Victim 2's alma mater, in England, and Victim 2 assisted Addy's son in the application process.

Victim 2 noticed that Addy and his wife spent a lot of money, consistent with Addy's claim that he was a diamond dealer. She and Addy exchanged text messages concerning possible investments. In texting with Victim 2, Addy used the same telephone number Addy had used with Victim 1. Addy urged Victim 2 to make a short-term or "bridge" loan to a contractor, V.V., through Addy's purported company, "Yarah Holdings PLC." Addy told Victim 2 that his company would fund half the loan if Victim 2 would fund the other half, and promised Victim 2 that if she funded $25,000 of the loan, "Yarah Holdings PLC" would repay her $30,000 in a few weeks. Addy and Victim 2 signed a promissory note on April 24, 2023; Victim 2 would introduce that note at trial. The note's terms called for Victim 2 to lend "Yarah Holdings PLC" $25,000 for the sole purpose of "Yarah Holdings PLC" making a bridge loan of $25,000 to V.V., and required "Yarah Holdings PLC" to repay Victim 2 $30,000 on June 4, 2023.

Victim 2 made a $4,000 transfer to the "Yarah Holdings PLC" Venmo account on or about April 22, 2023. A representative of Venmo would testify at trial that this transfer was processed through servers located in Virginia. On May 1, 2023, Victim 2 wire transferred the remaining $21,000 from a Bank of America branch located in the Eastern District of Pennsylvania, to a Green Dot account, through Bill.com's servers in Texas. V.V. would testify at trial that although he knows Addy, Addy did not make the bridge loan to him, and neither did Addy's purported company, "Yarah Holdings PLC." Instead, a financial analyst would introduce documents showing that Addy used the money for his own personal benefit. Victim 2 would testify that Addy never repaid Victim 2 anything.

*Count Sixteen – Bank Fraud Against Addy's Credit Union*

At trial, a representative of Members 1st Federal Credit Union, where Addy held an account, would introduce records showing that Addy opened his account, ending x2508, in June 2020. The records would include proof that the deposits of the credit union were insured by the National Credit Union Administration, NFCU charter number 6694, during the indictment period. The records would show further that on or about June 11, 2021, prior to any deposits, Addy's account held a balance of approximately $97.78. Documents and audio recordings of telephone calls with Addy would show that:

On or about June 11, 2021, at the credit union branch located in Lititz, PA, Addy deposited check number 2112, drawn on the BB&T Bank account of the spa he managed for Victim 1, in the amount of $8,500, into his account at the credit union. Addy immediately withdrew $2,000 cash against the deposited check. Also on or about June 11, 2021, at a different credit union branch located in Millersville PA, Addy withdrew $6,500 in cash from his account, against the deposited spa check.   The $6,500 was the remainder of the face value

of the check written on the spa account at BB&T, that he (Addy) had deposited earlier that day.

On or about June 15, 2021, the credit union was notified that the $8,500 check that Addy had deposited, drawn on the spa's bank account, had been returned due to insufficient funds. Two days later, on June 17, 2021, a fraud investigator for the credit union (the "Investigator") sent a letter to Addy and left him a voicemail informing Addy of the returned check and the need for him to repay the credit union, as Addy's account had a negative balance.

On or about June 21, 2021, Addy called the Investigator on a recorded telephone line, claiming that the issuer of the returned check, the spa, was a customer of his, and promising the Investigator that he would repay the credit union as soon as the issue with his customer was fixed. Addy's statements to the Investigator were false because, as Addy well knew, the spa was not his customer; instead, Addy was managing the spa for Victim 1, and Victim 1 was the sole signatory on the spa's BB&T Bank account. Members of the jury could examine for themselves the signature on the $8,500 check and compare it with (1) Victim 1's actual signature, and (2) a previous instance of Addy forging Victim 1's signature. The jury could conclude that the signature on the $8,500 check did not resemble Victim 1's real signature. Instead, the jury could conclude that the signature on the $8,500 resembled Addy's forgery of Victim 1's signature, making it likely that Addy forged Victim 1's signature on the $8,500 check.

On or about July 22, 2021, Addy called the Investigator, again on a recorded line. Addy claimed that he was unable to get a repayment plan from his customer, the spa. Addy said that he would recoup the money from the spa and return the funds to the credit union. Addy's statements to the Investigator on this second call were false for the reasons stated above.

Based upon the false statements made by Addy to the Investigator in the second call, the

Investigator agreed that Addy could have until November 1, 2021, to make full repayment of the $8,500. But on November 1, 2021, the agreed-upon date for repayment, Addy did not repay the credit union the $8,500 he had taken by fraud.  After November 1, 2021, Addy communicated with the Investigator, offering her false reassurances and promises in order to delay and prevent discovery by law enforcement of his misconduct.

## V.        **PLEA AGREEMENT**

The parties have executed a plea agreement, which will be presented to the Court during a hearing regarding entry of the guilty plea, in which the defendant agrees to plead guilty to 13 counts of wire fraud (Counts 1-13), two counts of aggravated identity theft (Counts 14 and 15) and one count of bank fraud (Count 16), as charged in the indictment. The plea agreement is made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) and provides that the following specific sentence is the appropriate disposition of the case: 51 months imprisonment on Counts 1 through 13 and 16, to run consecutive to concurrent 24 month terms of imprisonment on Counts 14 and 15, for a total term of imprisonment of 75 months; three years of supervised release; restitution of $755,995; and a fine, if any, and forfeiture as determined by the Court. If the Court does not accept the plea agreement, then either the defendant or the government will have the right to withdraw from the plea agreement, and the defendant will have the right to withdraw the guilty plea. The agreement contains joint stipulations to a loss amount and acceptance of responsibility, along with an appellate waiver. The agreement includes a supplement to be filed under seal.

The guilty plea hearing is scheduled for April 9, 2026, at 9:30 a.m.

- 20 -

## VI.   <u>CONCLUSION</u>

The government requests that the Court conduct a hearing under Federal Rule of Criminal

Procedure 11 and if warranted then accept the defendant's plea of guilty.

Respectfully submitted,

DAVID METCALF
United States Attorney


 */s Mary E. Crawley*
MARY E. CRAWLEY
Assistant United States Attorney

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this Change of Plea Memorandum has been served by email on:

Nancy MacEoin, Esq.
Federal Defender
Nancy_Maceoin@fd.org

<u>/s Mary E. Crawley</u>
MARY E. CRAWLEY
Assistant United States Attorney

DATED: April 1, 2026

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA          :

          v.                                    :          **CRIMINAL NO. 25-444-JMG**

MATTHEW JAMES ADDY          :

**GUILTY PLEA AGREEMENT**

Under Rule 11 of the Federal Rules of Criminal Procedure, the government, the

defendant, and the defendant's counsel enter into the following guilty plea agreement. Any

reference to the United States or the government in this agreement shall mean the Office of the

United States Attorney for the Eastern District of Pennsylvania.

1.      The defendant agrees to plead guilty to Counts 1 through 16 of the indictment

charging him with wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1 through 13);

aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts 14 and 15); and bank fraud,

in violation of 18 U.S.C. § 1344 (Count 16); and not to contest forfeiture as set forth in the notice

of forfeiture charging criminal forfeiture under 18 U.S.C. § 981(a)(1)(C), all arising from his

activities in Lancaster County between January 2020 and June 2023, when he operated

investment fraud schemes against two victims, stealing one victim's identity twice in the process,

and committed bank fraud against a credit union. The defendant further acknowledges his waiver

of rights, as set forth in the attachment to this agreement.

2.      The parties agree that this plea agreement is made pursuant to Federal Rule of

Criminal Procedure 11(c)(1)(C) and that the following specific sentence is the appropriate

disposition of the case: 51 months' imprisonment on Counts 1 through 13 and 16, to run

consecutive to concurrent 24 month terms of imprisonment on Counts 14 and 15, for a total term of imprisonment of 75 months; three years of supervised release; restitution of $755,995, and a fine, if any, and forfeiture as determined by the Court. If the Court does not accept this plea agreement, then either the defendant or the government will have the right to withdraw from the plea agreement and the defendant will have the right to withdraw the guilty plea.

3.      The defendant understands, agrees and has had explained to him by counsel that, in the absence of a government motion under 18 U.S.C. § 3553(e) or application of the "safety valve" provision in 18 U.S.C. § 3553(f), the Court must impose a mandatory minimum sentence of two years' imprisonment on Counts 14 and 15, charging aggravated identity theft, in violation of 18 U.S.C. § 1028A, and, on one of those counts, the sentence must be served consecutive to any other sentence imposed.

In addition, the defendant understands, agrees, and has had explained to him by counsel that the following statutory maximum sentences apply in this case: on each of Counts 1 through 13, charging wire fraud, in violation of 18 U.S.C. § 1343, a term of imprisonment of 20 years, a term of supervised release of three years, a fine of $250,000, and a special assessment of $100; on each of Counts 14 and 15, charging aggravated identity theft, in violation of 18 U.S.C. §1028A, two years' imprisonment, a term of supervised release of one year, a fine of $250,000, and a special assessment of $100; and on Count 15, charging bank fraud, in violation of 18 U.S.C. § 1344, a term of imprisonment of 30 years, a term of supervised release of five years, a fine of $1,000,000, and a special assessment of $100. The total permissible statutory maximum sentence is a term of imprisonment of 294 years including a mandatory consecutive sentence of two years on each of Counts 14 and 15; a term of supervised release of five years; a fine of $4,750,000; and a special assessment of $1,600. Full restitution of as much as $755,995 also

- 2 -

shall be ordered. Forfeiture of all proceeds from the offenses also may be ordered. The defendant further understands that supervised release may be revoked if its terms and conditions are violated. When supervised release is revoked, the original term of imprisonment may be increased by up to 3 years on Count 16, 2 years on Counts 1 through 13, and 1 year on Counts 14 and 15. Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will have to serve the original sentence, plus a substantial additional period, without credit for time already spent on supervised release.

4.    The government may:

a.    Recommend a sentence of imprisonment consistent with paragraph 2 above, and make whatever sentencing recommendation as to forfeiture which the government deems appropriate.

b.    Comment on the evidence and circumstances of the case; bring to the Court's attention all facts relevant to sentencing including evidence relating to dismissed counts, if any, and to the character and any criminal conduct of the defendant; address the Court regarding the nature and seriousness of the offense; respond factually to questions raised by the Court; correct factual inaccuracies in the presentence report or sentencing record; and rebut any statement of facts made by or on behalf of the defendant at sentencing.

c.    Nothing in this agreement shall limit the government in its comments in, and responses to, any post-sentencing matters.

5.    In order to facilitate the collection of the criminal monetary penalties to be imposed in connection with this prosecution, the defendant agrees fully to disclose all income, assets, liabilities, and financial interests, held directly or indirectly, whether held in his own name or in the name of a relative, spouse, associate, another person, or entity, and whether held

- 3 -

in this country or outside this country. Accordingly:

   a.    The defendant will submit a completed Financial Statement of Debtor to the U.S. Attorney's Office, in a form it provides and as it directs, within 14 days of execution of this plea agreement. The defendant promises that his financial statement and disclosures will be complete, accurate, and truthful.

   b.    The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on him in order to evaluate the defendant's ability to satisfy any monetary penalty imposed by the Court.

   c.    Upon request by the United States, the defendant also agrees to submit to a financial deposition or interview prior to sentencing, and provide all documents within the defendant's possession or control as requested by the U.S. Attorney's Office regarding the defendant's financial resources and that of the defendant's household.

   d.    The defendant agrees not to transfer, assign, dispose, remove, conceal, pledge as collateral, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States or victims. The defendant otherwise shall not devalue any property worth more than $1,000 before sentencing, without the prior approval of the United States.

   e.    The defendant also agrees to execute any documents necessary to release any funds held in any repository, bank, investment, other financial institution, or any other location in order to make partial or total payment toward any monetary penalty that the Court may impose.

   f.    If the defendant fails to comply with this paragraph of the plea agreement or if any of the defendant's representations pursuant to the requirements set forth in this paragraph are false or inaccurate, the government may elect to: void this agreement; and/or argue

- 4 -

that the defendant is not entitled to a downward adjustment for acceptance of responsibility under Guideline Section 3E1.1. The government may also elect to: void the forfeiture portion of the agreement and try the forfeiture before the Court and seek a larger forfeiture; and/or pursue any and all forfeiture remedies available at law or equity. The defendant agrees to waive any right to a trial by jury on all forfeiture issues, and to waive any claim at trial based on any statute of limitations.

6.      The defendant agrees to pay restitution of $755,995. The defendant agrees that restitution and any fine imposed by the Court shall be due and payable immediately and on such terms and conditions that the Court may impose. In the event the Court imposes a schedule for the payment of restitution or fine, the defendant understands and agrees that such a schedule represents a minimum payment obligation and does not preclude the United States Attorney's Office from pursuing any other means by which to satisfy the defendant's full and immediately enforceable financial obligation under applicable federal and/or state law.

7.      The defendant agrees that forfeiture, restitution, fine, assessment, tax, interest, or other payments in this case do not constitute extraordinary acceptance of responsibility or provide any basis to seek a variance from the applicable Sentencing Guideline range.

8.      The defendant agrees to pay the special victims/witness assessment in the amount of $1,600 at such time as directed by the Court.

9.      The parties agree to the following with respect to the forfeiture of assents:

a.      The defendant agrees to forfeit his right, title, and interest in the sum of $755,995, which represents the proceeds that he obtained from the offenses of wire fraud and bank fraud charged in Counts 1 through 13 and 16 of the indictment in this case, and agrees to the entry of a money judgment against him in this amount. The defendant agrees that, due to the

- 5 -

defendant's acts or omissions, these proceeds are not currently available to the government for forfeiture, that the conditions of 21 U.S.C. § 853(p)(1)(A)-(E) have been met, and that the government is entitled to the forfeiture of substitute assets because one or more of the conditions in 21 U.S.C. § 853(p) have been met.

b.      The defendant agrees to the entry of a preliminary order of forfeiture pursuant to Federal Rule of Criminal Procedure 32.2(b) as soon as possible after the guilty plea and before sentencing. Pursuant to Rule 32.2(b)(4), the defendant further agrees that, upon the request of the government, the preliminary order of forfeiture may be made final before his sentencing. The defendant waives all statutory deadlines, including but not limited to deadlines set forth in 18 U.S.C. § 983.

c.      The defendant acknowledges that forfeiture is part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty plea. The defendant further waives the requirements of Rules 32.2 and 43(a) of the Federal Rules of Criminal Procedure regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

d.      The defendant agrees to waive any and all constitutional, statutory, and other challenges to the forfeiture on any and all grounds, including any claims, defenses, or challenges arising under the Double Jeopardy or Excessive Fines Clauses of the Eighth Amendment, resulting from any forfeiture imposed in this case and/or any pending or completed administrative or civil forfeiture actions, and stipulates that such forfeiture is not grossly disproportionate to his criminal conduct.

- 6 -

10.    Except as provided in paragraph 2 above, the defendant may not withdraw his plea because the Court declines to follow any recommendation, motion, or stipulation by the parties to this agreement. No one has promised or guaranteed to the defendant what sentence the Court will impose.

11.    Pursuant to USSG § 6B1.4, the parties enter into the following stipulations under the Sentencing Guidelines Manual. It is understood and agreed that: (1) the parties are free to argue (except as stated below) the applicability of any other provision of the Sentencing Guidelines, including offense conduct, offense characteristics, criminal history, and adjustments; (2) these stipulations are not binding upon either the Probation Office or the Court; and (3) the Court may make factual and legal determinations that differ from these stipulations and that may result in an increase or decrease in the Sentencing Guidelines range and the sentence that may be imposed:

a.    The parties agree and stipulate that: $755,995 was the fraud loss caused in furtherance of the criminal activity undertaken by the defendant; this amount was reasonably foreseeable to the defendant in connection with the scheme; and the defendant's Guideline range should be calculated based on this amount pursuant to USSG § 1B1.3.

b.    The parties agree and stipulate that, as of the date of this agreement, the defendant has demonstrated acceptance of responsibility for his offense, making the defendant eligible for a 2-level downward adjustment under USSG § 3E1.1(a).

c.    The parties agree and stipulate that, as of the date of this agreement, the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying the government of his intent to plead guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their

resources efficiently, resulting in a 1-level downward adjustment under USSG § 3E1.1(b), if such a downward adjustment is applicable under the Sentencing Guidelines.

12. If the defendant commits any federal, state, or local crime between the date of this agreement and his sentencing, or otherwise violates any other provision of this agreement, the government may declare a breach of the agreement, and may at its option: (a) prosecute the defendant for any federal crime including, but not limited to, perjury, obstruction of justice, and the substantive offenses arising from this investigation, based on and using any information provided by the defendant during the investigation and prosecution of the criminal case; (b) upon government motion, reinstate and try the defendant on any counts which were to be, or which had been, dismissed on the basis of this agreement; (c) be relieved of any obligations under this agreement regarding recommendations as to sentence; and (d) be relieved of any stipulations under the Sentencing Guidelines. Moreover, the defendant's previously entered guilty plea will stand and cannot be withdrawn by him. The decision shall be in the sole discretion of the government both whether to declare a breach, and regarding the remedy or remedies to seek. The defendant understands and agrees that the fact that the government has not asserted a breach of this agreement or enforced a remedy under this agreement will not bar the government from raising that breach or enforcing a remedy at a later time.

13. If the Court accepts the plea agreement and imposes the sentence stated in paragraph 2 of this agreement, the government agrees that it will not file any appeal of the sentence in this case, and the defendant agrees that he will not file any appeal, any collateral attack, or any other writ or motion that challenges the defendant's conviction, sentence, or any other matter relating to this prosecution, including any assessment, forfeiture, restitution, or the length or condition of supervised release, whether such an appeal, collateral attack, or other writ

or motion arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law. As part of this knowing and voluntary waiver of the right to challenge the conviction and sentence, the defendant expressly waives the right to raise on appeal or on collateral review any argument that (1) the statutes to which the defendant is pleading guilty are unconstitutional and (2) the admitted conduct does not fall within the scope of the statutes. However, the defendant retains the right to file a claim, if otherwise allowed by law, that an attorney who represented the defendant during the course of this criminal case provided constitutionally ineffective assistance.

14.     If the Court does not accept the plea agreement and neither part withdraws from the plea agreement, and the defendant enters and maintains a guilty plea, then the parties agree to continue to recommend the sentence stated in paragraph 2, and the defendant voluntarily and expressly waives all rights to file any appeal, any collateral attack, or any other writ or motion that challenges the defendant's conviction, sentence, or any other matter relating to this prosecution, including any assessment, forfeiture, restitution, or the length or condition of supervised release, whether such an appeal, collateral attack, or other writ or motion arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law. As part of this knowing and voluntary waiver of the right to challenge the conviction and sentence, the defendant expressly waives the right to raise on appeal or on collateral review any argument that (1) the statutes to which the defendant is pleading guilty are unconstitutional and (2) the admitted conduct does not fall within the scope of the statutes.

a.     Notwithstanding the waiver provision above, if the government appeals from the sentence, then the defendant may file a direct appeal of his sentence.

- 9 -

b.    If the government does not appeal, then notwithstanding the waiver provision set forth in this paragraph, the defendant may file a direct appeal or petition for collateral relief but may raise only a claim, if otherwise permitted by law in such a proceeding:

    i.    that the defendant's sentence on any count of conviction exceeds the statutory maximum for that count as set forth in paragraph 3 above;

    ii.    challenging a decision by the sentencing judge to impose an "upward variance" above the final Sentencing Guideline range determined by the Court; and

    iii.    that an attorney who represented the defendant during the course of this criminal case provided constitutionally ineffective assistance of counsel.

If the defendant does appeal or seek collateral relief pursuant to this subparagraph (b), no issue may be presented by the defendant in such a proceeding other than those described in this subparagraph (b).

15.    The defendant acknowledges that pursuing an appeal or any collateral attack waived in either of the two preceding paragraphs may constitute a breach of this plea agreement. The government recognizes that the mere filing of a notice of appeal is not a breach of the plea agreement. The government may declare a breach only after the defendant or his counsel thereafter states, either orally or in writing, a determination to proceed with an appeal or collateral attack raising an issue the government deems barred by the waiver. The parties acknowledge that the pursuit of an appeal constitutes a breach only if a court determines that the appeal does not present an issue that a judge may reasonably conclude is permitted by an

exception to the waiver stated in the preceding paragraph or constitutes a "miscarriage of justice" as that term is defined in applicable law.

16.    The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

17.    The defendant is satisfied with the legal representation provided by the defendant's lawyer; the defendant and this lawyer have fully discussed this plea agreement; and the defendant is agreeing to plead guilty because the defendant admits that he is guilty.

18.    The parties have also entered a supplemental agreement that is filed under seal. It is agreed that the parties' guilty plea agreement, along with the sealed supplement, presents the entire agreement of the parties with regard to the defendant's guilty plea and sentence. The parties agree that neither has made any additional promise, agreement, or understanding other than those set forth in this written guilty plea agreement and the sealed supplement, and that no

additional promises, agreements, or understandings will be entered into unless in writing and signed by all parties.

DAVID METCALF
United States Attorney

_____
MATTHEW JAMES ADDY
Defendant

_____
NANCY MacEOIN
Counsel for the Defendant

Date: 3/17/24

*Salvatore L. Astolfi*
SALVATORE L. ASTOLFI
Chief, Criminal Division
Assistant United States Attorney

*/s Mary E. Crawley*
MARY E. CRAWLEY
Assistant United States Attorney

- 12 -

**Attachment**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

       v.                 :        CRIMINAL NO. 25-444-JMG

MATTHEW JAMES ADDY      :

## ACKNOWLEDGMENT OF RIGHTS

I hereby acknowledge that I have certain rights that I will be giving up by pleading guilty.

1.      I understand that I do not have to plead guilty.

2.      I may plead not guilty and insist upon a trial.

3.      At that trial, I understand

      a.      that I would have the right to be tried by a jury that would be selected from the Eastern District of Pennsylvania and that along with my attorney, I would have the right to participate in the selection of that jury;

      b.      that the jury could only convict me if all 12 jurors agreed that they were convinced of my guilt beyond a reasonable doubt;

      c.      that the government would have the burden of proving my guilt beyond a reasonable doubt and that I would not have to prove anything;

      d.      that I would be presumed innocent unless and until such time as the jury was convinced beyond a reasonable doubt that the government had proven that I was guilty;

      e.      that I would have the right to be represented by a lawyer at this trial and at any appeal following the trial, and that if I could not afford to hire a lawyer, the court would appoint one for me free of charge;

      f.      that through my lawyer I would have the right to confront and cross-examine the witnesses against me;

g.      that I could testify in my own defense if I wanted to and I could subpoena witnesses to testify in my defense if I wanted to; and

h.      that I would not have to testify or otherwise present any defense if I did not want to and that if I did not present any evidence, the jury could not hold that against me.

4.      I understand that if I plead guilty, there will be no trial and I would be giving up all of the rights listed above.

5.      I understand that if I decide to enter a plea of guilty, the judge will ask me questions under oath and that if I lie in answering those questions, I could be prosecuted for the crime of perjury, that is, for lying under oath.

6.      I understand that if I plead guilty, I have given up my right to appeal, except as set forth in the appellate waiver provisions of my plea agreement.

7.      Understanding that I have all these rights and that by pleading guilty I am giving them up, I still wish to plead guilty.

8.      I acknowledge that no one has promised me what sentence the Court will impose. I am aware and have discussed with my attorney that, at sentencing, the Court will calculate the Sentencing Guidelines range, and then, in determining my sentence, will consider the Guideline range and all relevant policy statements in the Sentencing Guidelines, along with other sentencing factors set forth in 18 U.S.C. § 3553(a), including

(1) the nature and circumstances of the offense and my personal history and characteristics;

(2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

- 2 -

(5) the need to provide restitution to any victims of the offense.

MATTHEW JAMES ADDY
Defendant

NANCY MacEOIN
Counsel for the Defendant

Dated: 3/17/26